UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATHANIEL WAHLIG, | : | CIVIL NO: 1:20-CV-02310 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, *Acting* | : | |
| *Commissioner of Social Security*,[1] | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

### I. Introduction.

    This is a social security action brought under 42 U.S.C. § 405(g).  The

plaintiff, Nathaniel Wahlig, seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying his claims for

supplemental security income under Title XVI of the Social Security Act.  We

have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set

---

    [1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, and
she is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P.
25(d) (providing that when a public officer sued in his or her official capacity
ceases to hold office while the action is pending, "[t]he officer's successor is
automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted
in accordance with this subsection shall survive notwithstanding any change in the
person occupying the office of Commissioner of Social Security or any vacancy in
such office.").

forth below, the Commissioner's decision will be affirmed, and judgment will be entered in favor of the Commissioner.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 16-1 to 15-17*.[2]  On September 5, 2018, Wahlig's mother protectively filed[3] an application for supplemental security income on behalf of Wahlig. *Admin. Tr.* at 132–37.  This application for benefits[4] was filed on September 5, 2018, nine days before Wahlig attained the age of 18 as defined by the applicable regulation. *See* 20 C.F.R. § 416.120(c)(4) ("An individual attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age.").  Thus, he was

_____

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Wahlig's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.*  Here, Wahlig's mother filed his application for benefits on September 25, 2018. *See Admin. Tr.* at 132.  But there are references in the record to the filing date as September 5, 2018. *See id.* at 59, 74.  And September 5, 2018, is the date identified by the ALJ as the date that the application for benefits was protectively filed. *Id.* at 78.

[4] This is not the first application for benefits on behalf of Wahlig.  In 2008, an Administrative Law Judge found that Wahlig, who at that time was a school-aged child, was disabled. *Admin. Tr.* 50–58.  Wahlig notes in his brief, that those benefits were terminated in 2013 due to excess household income. *Doc. 17* at 1 n.1.

seeking benefits as a child for that brief nine days and as an adult thereafter.  After the Commissioner denied his claim at the initial level of administrative review, Wahlig requested an administrative hearing. *Id.* at 103–112.  And on August 7, 2019, Wahlig, who was not represented by counsel, testified at a hearing before Administrative Law Judge ("ALJ") Gerard Langan. *Id*. at 9–49.  Wahlig's mother and a vocational expert also testified at the hearing. *Id.*

The ALJ determined that Wahlig was not disabled either during the nine-day period before he had attained age 18 or thereafter. *Id*. at 97–98.  And so, he denied Wahlig benefits. *Id*.  Wahlig appealed the ALJ's decision to the Appeals Council, which denied his request for review on October 20, 2020. *Id*. at 3–7.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In December of 2020, Wahlig, by then represented by counsel, began this action by filing a complaint claiming that the Commissioner's decision is not supported by substantial evidence and is contrary to law and regulation. *Doc. 1* at ¶ 7.  He requests that the court reverse and set aside the Commissioner's decision or, in the alternative, remand the case to the Commissioner for further proceedings. *Id*. at 2 (Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 12*.  The

Commissioner then filed an answer and a certified transcript of the administrative

proceedings. *Docs. 15, 16.*  The parties filed briefs, *see docs.* 17–19, and this

matter is ripe for decision.

## III.  Legal Standards.

### A.  Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's

application for benefits, "the court has plenary review of all legal issues decided by

the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

But the court's review of the Commissioner's factual findings is limited to whether

substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v.*

*Berryhill*, 139 S. Ct. 1148, 1152 (2019).  "[T]he threshold for such evidentiary

sufficiency is not high." *Biestek*, 139 S. Ct. at 1154.  Substantial evidence

"means—and means only—'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of*

*New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more

than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*,

48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial

evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict

created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's] finding

from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*,

383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

*Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Wahlig was

disabled, but whether substantial evidence supports the Commissioner's finding

that he was not disabled and whether the Commissioner correctly applied the

relevant law.


**B.  Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.**

To receive benefits under Title XVI of the Social Security Act, a claimant

generally must demonstrate an inability "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C.

§1382c(a)(3)(A); 20 C.F.R. § 416.905(a).[5]  To satisfy this requirement, a claimant

must have a severe physical or mental impairment that makes it impossible to do

his or her previous work or any other substantial gainful work that exists in the

national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).  Unlike

with disability insurance benefits under Title II of the Social Security Act,

"[i]nsured status is irrelevant in determining a claimant's eligibility for

supplemental security income benefits" under Title XVI of the Social Security Act.

*Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar.

22, 2017).  Supplemental Security Income "is a federal income supplement

program funded by general tax revenues (not social security taxes)" "designed to

help aged, blind or other disabled individuals who have little or no income." *Id.*

The ALJ follows a five-step sequential-evaluation process to determine

whether a claimant is disabled. 20 C.F.R. § 416.920.  Under this process, the ALJ

must sequentially determine: (1) whether the claimant is engaged in substantial

---

[5] The ALJ analyzed Wahlig's claim under both the standards applicable to
child claims and the standards applicable to adult claims.  Wahlig contends that the
ALJ failed to adequately develop the record given that he was proceeding pro se.
He also contends that the ALJ erred in connection with his determination of the
RFC and in connection with his questioning of the vocational expert.  Although the
first contention is applicable to both his claim for child benefits and his claim for
adult benefits, the latter two contentions relate to his claim for benefits as an adult.
Different standards apply to claims as child and claims as an adult.  Here, we set
forth only the standards applicable to an adult claim since Wahlig was only
considered a child for nine days of the applicable period, and other than his
contention that the ALJ failed to develop the record, he does not make a specific
claim regarding that period.

gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019). The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical

impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.[6]

On January 30, 2020, the ALJ denied Wahlig's claims for benefits. *Admin. Tr.* at 75–102.  At step one of the sequential-evaluation process, the ALJ found that Wahlig had not engaged in substantial gainful activity since the date of his application for benefits. *Id.* at 83–84.

---

[6] The ALJ analyzed the claim using both the standards applicable to child claims and the standards applicable to adult claims.  For reasons already noted, *see supra.* note 5, we set forth only the ALJ's decision regarding the adult claim.

At step two of the sequential-evaluation process, the ALJ found that Wahlig had the following severe impairments: autism, Asperger's syndrome, and major depressive disorder. *Id.* at 91.

At step three of the sequential-evaluation process, the ALJ found that Wahlig did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 91–94.

The ALJ then determined that Wydra has the RFC to perform full range of work at all exertional levels with some nonexertional limitations. *Id.* at 94.  The ALJ found that Wahlig "is able to understand, retain and carry out simple instructions with few work place changes[,]" and that he "is capable of occasional decision-making with respect to work-related activities." *Id.*  But the ALJ determined that Wahlig "should not engage in any fast production rate work[,]" and he "should avoid interaction with the public, except for incidental contact." *Id.* Finally, the ALJ concluded that Wahlig "may maintain occasional interaction with co-workers and supervisors; however, he should avoid any group, team, or tandem work activity. *Id.*  In making this RFC assessment, the ALJ reviewed Wahlig's assertions and testimony as well as the assertions and testimony of his mother. *Id.* at 95.  He also considered Wahlig's educational and treatment records and daily

activities. *Id*. at 94–95.  And he considered the opinion evidence in the record. *Id*. at 96.

At step four of the sequential-evaluation process, the ALJ found that Wahlig had no past relevant work. *Id*. at 96.

At step five of the sequential-evaluation process, considering Wahlig's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as janitor/cleaner, hand packager, and order filler—that exist in significant numbers in the national economy that Wahlig could perform. *Id*. at 97.

In sum, the ALJ concluded that Wahlig was not disabled. *Id*. at 97–98. Thus, he denied Wahlig's claims for benefits. *Id*. at 98.

## V. Discussion.

Wahlig presents three claims.  First, he claims that the ALJ failed in his duty to develop the record fully and fairly.  Second, Wahlig claims that the ALJ's RFC is not supported by substantial evidence.  And Third, Wahlig claims that the ALJ's decision is not supported by substantial evidence because the ALJ's hypothetical questions to the vocational expert did not reflect of all his credibly established functional limitations.  For the reasons discussed below, we conclude that Wahlig's claims are without merit.

**A.  The ALJ did not fail to develop the record.**

After Wahlig requested a hearing before an ALJ, he was sent a letter acknowledging his request ("Request for Hearing Acknowledgement Letter"). *Admin. Tr.* at 113–27.  Among other things, that letter explained that Wahlig had the right to representation. *Id.* at 114, 117–18.  And attached to the Request for Hearing Acknowledgement Letter was a list of organizations that may be able to help a claimant obtain representation. *Id.* at 119–22.

Wahlig appeared at the hearing before the ALJ without counsel.  At the outset of the hearing, the ALJ advised Wahlig that he may be represented—by an attorney or non-attorney representative—if he so chose. *Id.* at 11.  After explaining to Wahlig that such representatives are typically paid based on a contingent-fee agreement, but there are some agencies that may assist him without charging a fee, the ALJ told Wahlig that it was his decision whether he wanted to seek representation or to represent himself. *Id.* at 11-13.  And the ALJ explained that he would postpone the hearing to allow Wahlig time to find a representative. *Id.* at 13.

When the ALJ asked Wahlig how he wanted to proceed, Wahlig's mother responded that she called one attorney on the list provided, but that attorney did not return her call. *Id.* at 13–14.  She continued that "we thought we would come here, because we do have a lot of different evidence already from the school district and stuff, so we thought we would just represent ourselves." *Id.* at 14.  Turning to

Wahlig, the ALJ stated: "Okay.  I need all answers coming from you, because you're an adult.  This is your claim.  So, you can consult with your mom and all, I understand that, but everything has to come from you." *Id*.  Wahlig responded:  "I guess I'm representing myself then." *Id*.

The ALJ then gave Wahlig the written "Right to Counsel" form, and told him that if he had any questions, he could ask them. *Id*. at 14–15.  Other than asking the date, Wahlig had no questions about the form. *Id*.  And he completed and signed the form. *Id*. at 128.  On the form, he acknowledged that he had received the Request for Hearing Acknowledgement Letter prior to the hearing explaining his right to be represented, that he understood his right to be represented, and that he was willing to proceed without a representative. *Id*.

After Wahlig completed the form, the ALJ explained the hearing process, including the role of the vocational expert, and he admitted the exhibits into the record. *Id*. at 15–17.  The ALJ then acknowledged that it did not appear that the record was up to date, and he asked Wahlig some questions about his treatment providers, to try to determine what records he needed to obtain. *Id*. at 17–21.  And after taking testimony from Wahlig, Wahlig's mother, and the vocational expert, the ALJ stated that he was going to hold the record open to further develop the file. *Id*. at 48.  More specifically, he outlined what he was going to do:

> Okay, so here's what I've got to do.  I have to update the file with some additional records.  Those things that we talked

about at the beginning of the hearing from Guthrie and from
Concern Counseling and from Dr. Hudak and from Athens
School District and from Penn-York Opportunities.  I'm going
to send for all of that information and when I get it, I'm going
to send you copies of it, so that you'll have available to you all
of the information that I have available to me, when I'm making
my decision.  Once I receive all of that information and have
shared it with you, then I'll be in a position to be able to make a
decision and when I do that, I'll send you a copy of that
decision in the mail.  Understand?

*Id*.  Wahlig voiced his understanding. *Id*.

On September 11, 2019, the ALJ sent Wahlig a letter outlining the additional

evidence that he obtained. *Id*. at 697–98.  As relevant here, the letter also indicated

that the ALJ was unsuccessful in obtaining records from Penn York Opportunities,

Inc. *Id*. at 697.  The letter also provided that Wahlig could submit, among other

things, additional records. *Id*.  The letter closed by informing Wahlig that if the

ALJ does not receive a response from Wahlig withing ten days, he will assume that

Wahlig does not wish to submit additional evidence. *Id*. at 698.  Wahlig did not

respond to this letter.  Despite the ALJ's efforts to obtain additional evidence,

Wahlig now contends that the ALJ's efforts fell short, and he failed to fully

develop the record.[7]

---

[7] Wahlig titles his first argument: "The ALJ erred by failing [to] obtain a
knowing and intelligent waiver of representation and by failing to fully develop the
record in the case of an unrepresented claimant." *Doc. 17* at 13.  Except in passing
in a footnote (and without supporting caselaw), *see doc. 17* at 14 n.10, Wahlig does
not address whether his waiver of counsel was knowing and intelligent.  The
Commissioner asserts that Wahlig waived this issue. *See doc. 18* at 15.  We agree.

"Although the Supreme Court has described [Social Security Administration] administrative proceedings as 'adjudicative,' they are not classically so because they are 'non-adversarial,' and at times 'inquisitorial.'" *Anderson v. Comm'r of Soc. Sec.*, No. 21-2009, 2022 WL 1635628, at *2 (3d Cir. May 24, 2022) (footnotes omitted). "[T]he special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." *Dobrowolsky v. Califano*, 606 F.2d 403, 406–07 (3d Cir. 1979) (footnote omitted). The ALJ must play an "active role" in this regard. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). He or she has "a duty to develop a full and fair record[,]" and "must secure relevant information regarding a claimant's entitlement to social security benefits." *Id*. And when the claimant is unrepresented, the ALJ must "assume a more active role[.]" *Dobrowolsky*, 606 F.2d at 407. The "ALJ owes a duty to a pro se claimant to help him or her develop the administrative record." *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). "'When a claimant appears at a hearing without counsel,

---

*See United States v. Yung*, 37 F.4th 70, 81 (3d Cir. 2022) (concluding that appellant forfeited argument that "he "tuck[ed] it into a single footnote, without supporting authority or analysis"); *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 457 n.14 (E.D. Pa. 2012) ("An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote).").

the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore of all the relevant facts.'" *Id*. (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985)).

Where a claimant is unrepresented at the hearing before the ALJ, "the reviewing court must determine whether there was clear prejudice to the claimant or unfairness in the administrative hearing." *Jozefick v. Shalala*, 854 F. Supp. 342, 347 (M.D. Pa. 1994). "A hearing may be characterized as 'unfair' where the ALJ has failed to discharge his obligation to develop a complete record." *Id*. at 348. "The question is not 'whether every question was asked which might have been asked had [the claimant] been represented by an attorney, [but] whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Id*. (brackets in original) (quoting *Edwards v. Sullivan*, 937 F.2d 580, 585–86 (11th Cir. 1991)).

Wahlig contends that the ALJ failed to obtain all the relevant records from Concern Counseling Services, from Penn York Opportunities, and from Kayla Mapes. Addressing each of these three categories of records below, we conclude that the ALJ did not fail to develop the record.

## 1. Records from Concern Counseling Services.

Wahlig asserts that he began treatment with Concern Counseling Services ("Concern") in December of 2017. *See doc. 17* (citing *Admin. Tr.* at 1263 (record

from May 22, 2019 medication-management visit that lists treatment history including a reference to December 14, 2017)). He contends that after the hearing, the ALJ instructed the state agency to request additional records from Concern, but the ALJ apparently did not know that he began treatment in 2017, because the state agency only requested records from Concern from April 11, 2019, forward. *Id.*

The Commissioner counters that this is simply incorrect. She points out that in April 2019, which was before the hearing, the agency requested records from Concern. *See Admin. Tr.* at 1229 (authorization to disclose with no specific date limitation on the records), 1233 (authorization to disclose asking for records from 1/1/19 to the present). In response, Concern sent some records dated April 3, 2019, and April 10, 2019. *Id.* at 1231–46, 1226–30. The ALJ had these records before the hearing. *See id.* at 102 (listing these records as HO B11F, HO B12F), 1231-32 (listing May 14, 2019, as the date records were faxed to the agency). After the hearing, the agency requested records from Concern from April 11, 2019, to the present. *See id.* at 1258 (authorization to disclose asking for records from April 11, 2019, to the present). In response, Concern sent records dated May 22, 2019, and July 10, 2019. *Id.* at 1256–66.

The Commissioner concedes that the Concern did not provide records from prior to 2019. *Doc. 18* at 16. But she notes that the records that Concern did provide summarized Wahlig's treatment prior to 2019. *Id.* And those "records

indicate that [Wahlig] went to Concern for medication management in January and February 2018,[8] many months before the start of the relevant period and then treated with his primary care practice (Guthrie) until 2019 when he returned to Concern." *Id.* (footnote and citations to the record omitted).

Here, the agency requested documents from Concern on multiple occasions. And given that the records that were received included summaries of prior encounters, there are no evidentiary gaps which resulted in unfairness or prejudice to Wahlig with respect to the Concern documents.[9]  Thus, we cannot say that the ALJ failed to develop the record in this regard.

---

[8] The records also summarize an encounter in December 2017. *Admin. Tr.* at 1263.

[9] The Commissioner suggests that Wahlig should have submitted the missing records from Concern to the court. *See doc. 18* at 16.  Wahlig replies that he is not required to do so, and he cites some cases that he says support that assertion. *See doc. 19* at 5–6 (citing, *inter alia*, *Jozefick*, 854 F. Supp. at 349 (rejecting the Commissioner's argument that the claimant must show that the outcome of the case might reasonably have been different if she had been represented by an attorney, stating that "[n]o such requirement . . . can be discerned from the pertinent case law[,]" and that "cases have been remanded in order to more fully develop the record without requiring the claimant to make a specific proffer of the evidence that would be presented to the ALJ on remand") and *Coulter v. Weinberger*, 527 F.2d  224, 230  (3d Cir. 1975) (remanding where the ALJ failed obtain, among others, records that "might be expected to yield some data helpful to determine [the claimant's] conditions" at a certain time)).  Other cases, however, conclude that the claimant must present the missing records to the court. *See e.g. Brown v. Colvin*, No. 4:15-CV-00992, 2016 WL 6652360, at *2 (M.D. Pa. Nov. 10, 2016) (rejecting plaintiff's argument that the ALJ failed to properly develop the record, reasoning that his argument "fails because while he asserts that the records regarding his psychiatric treatment would 'certainly shed

## 2.  Records from Penn York Opportunities.

Wahlig contends that he participated in a program involving Penn York Opportunities ("Penn York") in the summer of 2018, but, according to Wahlig, the ALJ failed to obtain those records because, the agency only requested records from Penn York from September 14, 2019, forward, and Penn York responded that it had no such records. *See doc. 17* at 15.

Once again, the Commissioner shows that Wahlig has mischaracterized the record.  In November 2018, which was before the hearing before the ALJ, the agency requested records from Penn York. *See Admin. Tr.* at 1223–24 (letter and authorization to disclose records requesting records from 2017 to the present).  In December 2018, after not receiving a response from Penn York, the agency sent another letter to Penn York requesting the records. *See id*. at 1225.  Still not having received the records, on August 9, 2019, two days after the hearing before the ALJ,

---

much light' on [his] suspected suicide attempt, he has failed to bring these documents before the Court for review[,]" that "[b]ecause Plaintiff's counsel has neglected to substantiate this argument with copies of the records, I cannot identify any prejudice that has been caused by the omission of these documents[,]" and that "[a]s the magistrate judge correctly stated, the Court is not required to accept Plaintiff's bare assertions as to what these records would show").  We need not enter this fray because even assuming for the sake of argument that Wahlig is not required to present the specific missing documents at issue, his claim that the ALJ failed to develop the record regarding the Concern records fails because given that the records that have been submitted summarize the missing documents, Wahlig cannot show that there are any evidentiary gaps that resulted in unfairness or prejudice.

the agency again requested records from Penn York, this time asking for records from September 14, 2000 to the present. *See id.* at 1268–69.  And Penn York responded: "We do not have documents that are being requested." *Id.* at 1268.

Given that Penn York asserts that it does not have records, and Wahlig has not present a basis for the court to reasonably conclude that there are missing records from Penn York regarding Wahlig, we cannot say that the ALJ failed to develop the record in this regard.[10]

### 3.  Records from Kayla Mapes.

Prior to the hearing before the ALJ, Wahlig completed a form titled "Claimant's Recent Medical Treatment." *See Admin. Tr.* at 283.  That form asked whether he had recently been treated or examined by a doctor and, if so, to list the doctor's name, address and telephone number, the dates of treatment or examination, and what the doctor told him about his condition. *Id.*  On this form,

---

[10] Again, the Commissioner asserts that Wahlig should have attached the records, and again Wahlig bristles at that assertion. *See doc. 18* at 17, *doc. 19* at 5–6.  As noted above, however, *see supra* note 9, we need not determine whether Wahlig must submit the actual records at issue because, in this instance, as to the records of Penn York he has not even shown that such records exist.  Wahlig does assert that "it is likely that these records could have been obtained via a request to OVR [Office of Vocational Rehabilitation], but no such attempt was made." *Doc. 17* at 15.  But that is speculation.  And the record does contain records from OVR that cover the summer of 2018, at least through August 31, 2018. *See Admin. Tr.* at 196–214.  And Wahlig has not presented a basis for the court to think that there are additional missing OVR records.

under doctor's name(s), Wahlig listed, among others, Kayla Mapes. *Id.* He identified Mapes as with the Intellectual Disabilities Program with the Bradford County Human Services; he provided her address and telephone number; and in the date column, he wrote "5-21-19 to Review ISP." *Id.* In the section asking what this person told him about his condition, Wahlig stated: "Kayla's office has the testing on his Intellectual Disabilities and that he does have Autism." *Id.* In his brief, Wahlig contends that he listed Mapes "as a treatment source who was going to test 'his intellectual disabilities and that he does have autism' through the 'Intellectual disabilities Program' at Bradford County Human Services." *Doc. 17* at 15–16 (quoting *Admin. Tr.* at 283). But, he asserts, "[t]here is no indication that those records were requested." *Id.* at 16.

The Commissioner contends that Wahlig again mischaracterizes the record by suggesting that Mapes was going to test him. *Doc. 18* at 17–18. That seems a fair criticism as the document that Wahlig cites does not say that Mapes is going to test him; rather, it says that Mapes's office has the testing on this intellectual disabilities and it suggests that his Individual Support Plan ("ISP") is going to be reviewed. *Admin. Tr.* at 283.

The Commissioner also contends that the agency did obtain Wahlig's Bradford County ISP, which listed Mapes as the support coordinator. *Id.* at 18. In

fact, the record contains two ISPs—a June 2019 ISP and a September 2018 ISP.[11, 12]

The June 2019 ISP lists Mapes as the "Supports Coordinator." *Id*. at 294. And it lists May 21, 2019, as the "Annual Review Meeting Date." *Id*. Given that Wahlig wrote "5-21-19 to Review ISP" on the form regarding recent medical treatment, *see id*. at 283, it appears that it may be the June 2019 ISP to which he was referring. And that ISP is in the record. Moreover, although Wahlig suggests on the form that Mapes's office will confirm that he has autism, *see id.*, the ALJ, in fact, found that Wahlig's autism was a severe impairment, *id*. at 84, 91. In sum, we cannot say that the ALJ failed to develop the record by not requesting records from Mapes given that the record already contains the June 2019 ISP, and Wahlig

---

[11] We cannot ascertain the exact dates the ISPs were prepared. But within the one ISP, it states that the ISP was last updated on June 17, 2019. *Admin. Tr.* at 294. Thus, we will refer to this ISP as the June 2019 ISP. And within the other ISP, it states that it was last updated on September 18, 2018. *Id*. at 216. Thus, we will refer to this ISP as the September 2018 ISP.

[12] The Commissioner contends that Dr. Cloutier had the ISP when she opined that Wahlig could perform simple work. *Doc. 18* at 18. As Dr. Cloutier gave her opinions on January 25, 2019, *see Admin. Tr.* at 65, 67, 70, 73, she could not have had the June 2019 ISP. But Dr. Cloutier refers to an August 21, 2018 ISP. *See id*. at 63. That appears to be the ISP that we have referred to as the September 2018 ISP given that that ISP lists August 21, 2018, as the beginning of the applicable fiscal year. *See id*. at 216. In any event, Wahlig does not suggest that the September 2018 and the June 2019 are materially different such that Dr. Cloutier's opinion would have been different had she had the June 2019 ISP as opposed to the September 2018 ISP.

has not shown that it is reasonable to think that there are additional records from Mapes that are not part of the record.

### B. The ALJ's RFC's assessment is supported by substantial evidence.

Wahlig contends that substantial evidence does not support the ALJ's RFC assessment regarding limitations concerning interacting with others.  Before addressing Wahlig's specific arguments,[13] we set forth standards regarding the RFC assessment in general.

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359 n.1).  In assessing a claimant's RFC, the ALJ must consider all the evidence of

---

[13] We address Wahlig's specific arguments below.  We also note that in the heading of his claim regarding the RFC, Wahlig asserts that the ALJ "failed to account of his 'moderate' limitations in understanding, remembering, or applying information, concentration, persistence, or pace, and adapting and managing oneself." *Doc. 17* at 16.  But he fails to develop an argument in this regard in the body of his brief.  Thus, he has forfeited or waived that argument. *See New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 493 n.2 (3d Cir. 2020) ("As this argument was vaguely presented without factual or legal support, it is forfeited for lack of development."); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (noting that "arguments raised in passing . . .  but not squarely argued, are considered waived").

record. *Burnett*, 220 F.3d at 121.  "When a conflict in the evidence exists, the ALJ

may choose whom to credit but 'cannot reject evidence for no reason or for the

wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting

*Mason*, 994 F.2d at 1066).  The court's "review of the ALJ's assessment of the

plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is

supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL

4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113,

129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's]

residual functional capacity with the deference required of the substantial evidence

standard of review.").

    "Surveying the medical evidence to craft an RFC is part of the ALJ's

duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).  And "[i]n

evaluating medical reports, the ALJ is free to choose the medical opinion of one

doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d

Cir. 2009).

    Further, in setting the RFC, the ALJ must clearly articulate his or her

reasoning.  In other words, the ALJ must "set forth the reasons for his decision" to

allow for meaningful judicial review. *Burnett*, 220 F.3d at 119 (citing *Cotter*, 642

F.2d at 704–05.  Although an ALJ need not "use particular language or adhere to a

particular format in conducting his analysis," the ALJ must ensure "sufficient

development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  The ALJ's decision must set out "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704.  If an ALJ "has not sufficiently explained" how he or she considered all the evidence "'to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Dantzler v. Saul*, No. 3:16-CV-2107, 2019 WL 5569466, at *1 (M.D. Pa. Oct. 28, 2019) (quoting *Dobrowolsky*, 606 F.2d at 407).

Applying the above standards to the present record, we conclude that the ALJ's RFC determination is supported by substantial evidence.

Here, Wahlig takes issue with the ALJ's characterization of Wahlig's course of treatment as "'limited, routine, and conservative.'" *Doc. 17* at 17 (quoting *Admin. Tr.* at 95).  But the ALJ adequately reviewed Wahlig's course of treatment for the relevant period:

> The claimant's education record reflects that he was involved in a combination of regular and special education classes, namely itinerant emotional support for twenty percent or less of the school day in March 2019.  At a medication check in October 2018, it was noted that the school reported continued problems with impulsivity, increased motor activity, and classroom disruption; however, the claimant reported no school issues.  Nevertheless, the record reflects that the claimant graduated high school, was involved in an internship at his high school, and was accepted into college.  The claimant presented

for a consultative examination in January 2019, where it was
reported that the claimant was not currently involved in
outpatient therapy.  It was further reported at the consultative
examination that the claimant's mood is stable with medication
and he is somewhat unbothered by unexpected changes in
routine; however, he has limited social interest and generally
prefers to be alone.  The consultative examination revealed poor
eye contact, fair social skills, unkempt and malodorous
appearance, poor eye contact, limited insight, fair judgment,
and mildly impaired attention, concentration, and memory
skills.  However, it also describes cooperative attitude, clear
sensorium, normal motor behavior, fluent speech, neutral mood,
full range and appropriate affect, and coherent and goal directed
thought process with no evidence of hallucinations, delusions,
or paranoia.  While the consultative examiner estimated the
claimant's intellectual functioning to be high below average to
low average range, intelligent testing in March 2010 revealed a
full scale IQ of 101.  Subsequent mental status examinations by
the claimant's treating mental health professionals in April and
May 2019 describe fair eye contact, fair motivation to change,
and fair judgment and insight, but otherwise revealed alert and
oriented behavior, appropriate affect, intact attention and
concentration skills, logical thought form, intact memory skills,
average intelligence, appropriate appearance, appropriate
speech, and goal-directed thought processes without
hallucinations, delusions, obsessions, compulsions, mania,
phobias, impulsivity, or suicidal or homicidal ideations.  The
claimant's mother testified at the hearing that psychotropic
medication had significantly helped with the claimant's anger
and outbursts.

*Id*. at 94–95 (citations to the record omitted).

In disagreeing with the ALJ's characterization of his course of treatment,

Wahlig points out that he has been receiving therapy since he was eight years.  But

for the relevant time period, the ALJ's characterization of Wahlig's course of

treatment of "limited, routine, and conservative," is supported by the ALJ's summary of that treatment.

Wahlig also contends that the evidence does not support the ALJ's contention that he "'retained the ability to perform a wide range of daily activities" such as participating in an internship and that he understands that "there are social standards he must adhere to, such as bathing." *Admin. Tr.* at 95. In this regard, Wahlig asserts that the internship lasted only a month, and that "understanding that he *should* bathe is not the same as actually doing it, and the record very clearly shows that the plaintiff does not bathe, brush his teeth, or change his clothes unless his mother forces him to." *Doc. 17* at 18 (italics in original; citations to the record omitted). True. But given that Wahlig testified at the hearing before the ALJ, which was held on August 7, 2019, that he started his internship approximately two weeks before and that the internship would probably end around the first day of school, *see Admin. Tr.* at 25, there is no basis to think that the ALJ thought the internship was anything long term. And throughout his decision, the ALJ repeatedly acknowledged Wahlig's hygiene issues. *See id.* at 85 ("[T]he claimant's mother testified that the claimant will not bathe or care for his personal hygiene, unless made to."), 90 ("[I]t was reported that the claimant needed to be reminded to care for his personal hygiene."; "[T]he claimant's mother testified that the claimant will not bathe or care for his personal hygiene unless he is forced . . . .");

26

92 ("The record reflects that the claimant needs to be told to care for his personal hygiene; however, he acknowledged at the hearing that he is aware that he should adhere to social norms and does bathe when necessary if he is around people."; "The record reflects that the claimant will not care for his personal hygiene unless he believe [sic] it to be necessary."); 93 ("The claimant and his mother testified that the claimant would not bathe regularly; however, the claimant also testified that he is aware of social norms that he is expected to adhere to and that he does not feel that caring for his hygiene is important unless he will be seeing other people.").  Moreover, that ALJ adequately went through the evidence and explained his RFC determination.

And while Wahlig points to evidence that he contends supports additional limitations and suggests that the court accept his analysis of the evidence over the analysis set forth by the ALJ, we cannot reweigh the evidence. *Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (citation omitted)).  And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v.*

*Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009). In sum, the ALJ

fulfilled his duty in evaluating Wahlig's contentions regarding his symptoms and

limitations and weighed them against the entire record. In doing so, the ALJ

provided an explanation for affording limited weight to Wahlig's contentions.

Thus, we conclude that that ALJ's decision regarding Wahlig's RFC is supported

by substantial evidence.[14]

---

[14] In his reply brief, Wahlig raises a new argument. He argues for the first time that the ALJ failed to address limitations in a June 15, 2018 OVR report. *See doc. 19* at 8. Wahlig contends that this reports indicates that when he "participated in a work-based learning program in the summer of 2018, his job coach observed him shut down and refuse to interact with anyone who yelled at him or raised their voice, was easily distracted, was often fiddling with something in his hand or pacing, had difficulty making decisions without knowing every specific detail for fear that the variables may change, had a 'dark' sense of humor [and] would often joke about things that other people do not find funny, and struggle[d] with personal relationships, acknowledging other's feelings, and expressing his emotions." *Id*. But Wahlig mischaracterizes the record. Although there is a record that references these issues, it does not indicate that Wahlig's job coach observed these things. *See Admin. Tr.* at 221. Rather, it appears that many of these observations were based on reports from Wahlig or his mother, and not specifically related to the summer program. *Id*. The only thing this record says about the summer 2018 program is that Wahlig "participated in the WBLE program through OVR in the summer of 2018, though he enjoyed having an income he stated that none of the jobs interested him." *Id*. (allcaps removed to aid readability). And it says nothing about his job coach making any statements. *Id*. In addition to mischaracterizing the record, Wahlig failed to raise this argument in his opening brief; rather, he raised it for the first time in his reply brief. Thus, we will not consider this argument further. *See Bell v. Lackawanna Cty.*, 892 F. Supp. 2d 647, 688 n.41 (M.D. Pa. 2012) ("A reply brief is not the appropriate forum in which to raise new issues and the court need not address issues raised for the first time therein.").

### C. The ALJ appropriately relied on the vocational expert's testimony.

Wahlig claims that the ALJ's decision is not supported by substantial evidence because the hypothetical questions that the ALJ asked the vocational expert did not reflect all his credibly established functional limitations.  We disagree.

The ALJ concluded that Wahlig was moderately limited in "understanding, remembering, or applying information," in "interacting with others," and in "concentrating, persisting, or maintaining pace." *Admin. Tr.* at 92.  Wahlig contends that the ALJ failed, however, to adequately address those limitations in his hypotheticals to the vocational expert or in his RFC.  But the ALJ did include nonexertional limitations in his RFC to account for those limitations.  He limited Wahlig to jobs that only require him to be "able to understand, retain and carry out simple instructions with few work place changes[,]" and to be "capable of occasional decision-making with respect to work-related activities " *Id*. at 94.  The ALJ also determined that Wahlig "should not engage in any fast production rate work[,]" and he "should avoid interaction with the public, except for incidental contact." *Id*.  The ALJ further concluded that Wahlig "may maintain occasional interaction with co-workers and supervisors; however, he should avoid any group, team, or tandem work activity. *Id*.  And the ALJ included all these limitations in his second hypothetical to the vocational expert, to which the vocational expert

testified that there were jobs that such a hypothetical individual could perform. *Id.* at 46–47.

While Wahlig suggests that there are additional limitations that the ALJ should have included in his RFC assessment and in his hypothetical questions to the vocational expert, except as to the one limitation (missing more than two days of work a month) addressed below, Wahlig does not specify what those additional limitations should have been.  And the ALJ adequately explained his decision to include the limitations that he did.  That is all that is required. *See Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209–211 (3d Cir. 2019) (concluding that an ALJ is not required to use any particular language, but an ALJ must provide a valid explanation for the limitations he or she finds).

The ALJ asked the vocational expert a third hypothetical that in addition to containing the above limitations included the limitation that the hypothetical individual would likely miss more than two day of work per month. *Admin. Tr.* at 47.  The vocational expert responded that that additional limitation "would eliminate all the positions provided in both [previous] hypotheticals," and that she could not identify any other jobs that such a hypothetical individual could perform. *Id*.  Wahlig suggests that the third hypothetical is the one on which the ALJ should have relied, but he does not develop an argument for why the ALJ should have chosen the third hypothetical.

Wahlig also contends that the ALJ failed to explain why he did not rely on the third hypothetical.  But is clear why the ALJ did not rely on the third hypothetical: because he did not find that Wahlig would likely miss more than two days of work a month.  As recounted above, the ALJ's RFC assessment is supported by substantial evidence.  "While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworney v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  But an ALJ is not required to accept a vocational expert's opinion or testimony if that opinion is premised on limitations that the ALJ did not accept. *See Craigie v. Bowen*, 835 F.2d 56, 57–58 (3d Cir. 1987).

Based on the ALJ's comprehensive analysis and because he considered all the evidence of the record, the ALJ's RFC assessment is supported by substantial evidence.  And because the RFC assessment is supported by substantial evidence, the ALJ did not err in failing to credit the vocational expert's response to a hypothetical question that presented the hypothetical individual to be more limited than the ALJ determined Wahlig to be.

## VI.  Conclusion.

For the foregoing reasons, we will affirm the decision of the Commissioner.

An appropriate order follows.


***S/Susan E. Schwab***
Susan E. Schwab
United States Magistrate Judge